**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

```
KEVIN JACKSON,              :
                           :    Civil Action No. 04-2145 (AET)
            Petitioner,     :
                           :
            v.              :    OPINION
                           :
ROY L. HENDRICKS, et al.,   :
                           :
            Respondents.    :
```

**APPEARANCES:**

> KEVIN JACKSON, Petitioner <u>Pro Se</u>
> #207013 SBI#291833B
> New Jersey State Prison
> CN 861
> Trenton, New Jersey 08625
>
> WILLIAM KYLE MEIGHAN, ESQ.
> Ocean County Prosecutor's Office
> P.O. Box 2191
> 119 Hooper Avenue
> Toms River, New Jersey 08754
> Counsel for Respondents

**THOMPSON,** District Judge

This matter is before the Court on Petitioner Kevin Jackson's petition for habeas corpus relief under 28 U.S.C. § 2254.  For reasons discussed below, the petition for habeas corpus relief will be denied for lack of merit.

I.   <u>BACKGROUND</u>

A.   <u>Statement of Facts</u>

The facts of this case were recounted below and this Court, affording the state court's factual determinations the appropriate deference, <u>see</u> 28 U.S.C. § 2254(e)(1), will simply reproduce the Appellate Division's factual recitation, as set forth in its February 29, 1996 <u>per</u> <u>curiam</u> Opinion on direct appeal from the re-trial and conviction of petitioner:

The evidence supports a finding of the following facts:

Levithan, a first grade teacher from Brick, spent September 2, 1985, with two friends at the beach, after which they met at about 6:00 p.m. at Levithan's house for dinner.  Faga Fiorino left Levithan's apartment at about 9:40 p.m. and heard her bolt the door.  During the night, Levithan's neighbor, Irwin Stein, was awakened by what he thought were a woman's violent screams, although he could not determine who was screaming, and returned to bed.

When Levithan failed to show up for school on September 3, 1985, her friends summoned the police, who entered the apartment with the manager's pass key.  They discovered Levithan's body on her bed, with a pillow over her head and evidence of numerous stab wounds.  At the time of death, Levithan was 5'4" tall, weighed 140 pounds and was a healthy, fifty-one-year old.  She had been stabbed fifty-three times, suffered punctured lungs and fractured ribs, and had lived between ten and fifteen minutes after being stabbed, during which time she was conscious while she bled to death.  There was no sign of forced entry in the apartment and all the fingerprints which could be identified were Levithan's.

On the night of September 3, 1985, William Brown, who had never before met defendant, made defendant's acquaintance in Lakewood.  Defendant was driving a Datsun 300zx car and wanted to buy marijuana.  They bought and consumed beer while driving around, and eventually defendant dropped Brown off and left.  Brown noticed nothing unusual about defendant except that he wore driving gloves.  Later, Brown was

questioned by police who were canvassing the area, and he mentioned his encounter with defendant and the car he was driving. The police went to defendant's apartment, which was in the same complex as Levithan's apartment, and knocked on the door at about 3:00 a.m. on the morning of September 4, 1985.

Defendant was arrested for the theft of Levithan's car (the Datsun), was taken to the police station and, at 3:29 a.m., signed a form advising him of his Miranda rights. Defendant agreed to give a statement. Upon initial questioning by police investigator Michael Mohel, defendant claimed he had an alibi to establish his presence in his apartment the entire night of September 3, 1985. When advised by Mohel that his alibi witness had not supported this claim, defendant recanted and admitted he went to Levithan's apartment for consensual sex, then stabbed her many times because she threatened to "cut his dick off." Defendant admitted he took a few dollars and drove off in Levithan's car.

The State's expert forensic serologist, Juan Brown, testified at trial that the semen found on the victim and the bed was inconclusive as to defendant, since he is a "non-secretor" whose blood type cannot be identified from semen. The State's expert pathologist, Albert Basri, identified defensive wounds on Levithan's hands in addition to her other injuries. Levithan would have had a good chance of survival had she received medical care immediately after being stabbed.

Defendant's expert neuropsychiatrist, Jonathan Willard-Mack, testified that, due to brain damage likely suffered in childhood, defendant suffered significant impairment which rendered him subject to "perseveration," by which he lost the ability to stop hurting his victim. In essence, defendant got "stuck" on stabbing Levithan once he started and was not acting with purpose or awareness in continuing to do so or in causing death. According to Willard-Mack, defendant intentionally went to the apartment and intentionally started to hurt Levithan, but "at some point" perseverated and killed her without purpose or knowledge.

The State's rebuttal expert neurologist, Richard Harner, found no evidence of brain dysfunction and opined that defendant acted with knowledge and purpose. The State's rebuttal expert neuropsychologist, John Gordon, opined that defendant never suffered perseveration or brain impairment.

Defendant rebutted this evidence with another expert psychologist, Edward Dougherty, who opined that defendant suffered organic brain damage which caused his brain functioning to be much below average.

B.  Procedural History

On September 19, 1986, petitioner, Kevin Jackson ("Jackson"), entered a guilty plea, pursuant to a plea agreement, to Count One for capital murder and Count Three for theft.  The second count of the indictment was dismissed per the plea agreement.  After a penalty phase trial in January 1987, a jury pronounced a death sentence on February 6, 1987 on the capital murder charge.  On October 28, 1988, Jackson was sentenced on the theft count to five years in prison to run concurrent with the death sentence.

On April 18, 1990, the New Jersey Supreme Court vacated the death sentence and remanded the matter for re-trial.  A new jury trial began on May 4, 1992, but was stayed by Order of the New Jersey Supreme Court until July 20, 1992.  The guilt phase of the trial concluded on August 27, 1992.  The jury found Jackson guilty on all three counts of the indictment (Count Two was amended to attempted aggravated assault).[1]  The new penalty phase of the trial concluded on September 8, 1992.  The jury did not impose the death penalty.  A sentencing hearing was conducted on October 9, 1992, and the trial court sentenced Jackson to life

---

[1]  The initial indictment charged petitioner with aggravated sexual assault.

4

imprisonment with a 30 year parole disqualifier on Count One (murder); 10 years in prison with a 5-year period of parole ineligibility on Count Two (attempted aggravated assault); and five years in prison on Count Three (theft).  Counts Two and Three were to run concurrent to each other, but the sentence imposed on Count One was consecutive to the other two counts. Thus, the aggregate sentence was life with a 35-year parole disqualifier.

Jackson appealed his conviction and sentence to the New Jersey Appellate Division.  The sentence and conviction were affirmed in an unpublished <u>per curiam</u> Opinion issued on February 29, 1996.  The New Jersey Supreme Court denied certification on June 5, 1996.

Thereafter, on April 22, 1997, Jackson filed a state motion for post-conviction relief ("PCR").  The PCR motion was denied without prejudice on August 11, 1997.  The state PCR court allowed Jackson's counsel to re-instate the PCR petition within 90 days from July 25, 1997.  Jackson filed a notice of appeal on September 15, 1997.  On June 11, 1998, the state PCR court dismissed the PCR petition.  On April 3, 2000, the Appellate Division reversed the denial of the PCR petition and remanded the matter for reinstatement of the petition and assignment of counsel.

On August 25, 2000, a hearing was conducted with regard to the reinstated state PCR petition.  The Honorable James Citta, J.S.C. denied the PCR petition that same day.  Jackson appealed and on November 13, 2002, the Appellate Division affirmed the denial of post-conviction relief.  Jackson then filed a motion for reconsideration.  The Appellate Division re-affirmed its denial of the state PCR petition on January 3, 2003.  The New Jersey Supreme Court denied certification on May 8, 2003.

On February 13, 2003, Jackson filed a petition in state court for a DNA testing procedure.  Judge Citta denied the petition on June 13, 2003.  An appeal was pending in the Appellate Division at the time Jackson filed this federal habeas petition.  Jackson does not raise in this habeas petition any claim with respect to DNA testing procedures.  However, in his petition, he states that he reserves the right to petition this Court on the DNA issue after final state court review.

Jackson filed a petition for habeas corpus relief under 28 U.S.C. § 2254 on or about April 30, 2004.[2]  With this Court's

_____

[2]  The habeas petition was not received by the Court until May 7, 2004.  However, giving Jackson the benefit of all inferences related to the date he filed his petition, the Court finds that Jackson "filed" his petition on the date he handed it to prison officials to be mailed to the Court for filing.  See Houston v. Lack, 487 U.S. 266, 276 (1988); Burns v. Morton, 134 F.3d 109, 113 (3d Cir. 1998)(incorporating the "mailbox rule" for habeas petitions submitted by inmates confined in an institution).  Because the Court does not know the exact date on which Jackson handed his petition to prison officials for mailing, it will use the date on which he signed his habeas

permission, petitioner was permitted to file an amended petition
raising ten additional claims in his petition so as to make his
petition one, all-inclusive petition as required under 28 U.S.C.
§ 2254.  Jackson filed his amended petition on October 26, 2004.
(Docket Entry No. 10).  On November 1, 2004, the Court directed
respondents to answer the petition, and the respondents filed an
answer, with affirmative defenses, and the pertinent state court
record, on or about January 26, 2005.  (Docket Entry No. 17).  On
September 1, 2005, Jackson filed a motion for an evidentiary
hearing and a separate motion for the Court to take judicial
notice of a recent United States District Court Opinion; briefs
in support of these motions were filed simultaneously.  (Docket
Entry Nos. 19, 20, 21, & 22).  On September 8, 2005, Jackson
filed traverse objections to the respondents' answer.  (Docket
Entry No. 23).  The respondents filed a brief in opposition to
Jackson's motions on September 26, 2005.  (Docket Entry No. 24).
On April 28, 2006, this Court denied Jackson's motion for an
evidentiary hearing and his motion for the Court to take judicial
notice of a recent United States District Court Opinion.  (Docket
Entry Nos. 25, 26).

## II.  <u>STATEMENT OF CLAIMS</u>

In his habeas pleadings, Jackson raises the following claims
for habeas relief: (1) petitioner was denied due process and

---

petition, April 30, 2004.

equal protection because his death penalty case was excluded from
the Grand Jury for indictment; (2) the indictment and trial were
racially motivated because Jackson is of African-American descent
and the victim was Caucasian; (3) petitioner's  confession should
have been suppressed as "fruit of the poisonous tree" because the
police entered and searched petitioner's home without a warrant;
(4) counsel was ineffective in failing to call an expert witness
in his Miranda hearing; (5) prosecutorial misconduct; (6)
petitioner was denied the right to testify during the guilt phase
of the trial; (7) both the first trial and the second or re-trial
were racially biased; (8) petitioner received a harsher sentence
on re-trial and was prejudiced by the failure to conduct a new
pre-sentence report; and (9)the trial court refused to give a
jury charge on petitioner's intoxication defense and diminished
capacity.

Jackson also claims that he has exhausted all of his state
court remedies, and that his petition should be deemed as "filed"
pursuant to the "mailbox rule".  He filed a traverse to the
State's answer on September 8, 2005, asserting that his petition
was timely filed and that none of his claims asserted are
procedurally defaulted or unexhausted.  Jackson also contends
that his ineffective assistance of counsel claims are never
barred because the Sixth Amendment right to counsel is
fundamental to a fair trial, and that the Court should take

judicial notice of the State's "systematic exclusion of petitioner" from state and federal constitutional rights in a capital murder case.

The State answered the petition alleging that petitioner's grounds for habeas relief are without merit.  Respondents also raise the affirmative defense that Jackson's habeas petition is time-barred under 28 U.S.C. § 2244(d)(1).  Respondents further assert that some of the claims raised in the federal habeas petition are unexhausted and/or procedurally defaulted.

### III.   STANDARD OF REVIEW

A pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.  Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972). A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.  See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399 U.S. 912 (1970).

### IV.   STATUTE OF LIMITATIONS ANALYSIS

The Court will first address the State's affirmative defense that Jackson's habeas petition is time-barred.  The limitation period for a § 2254 habeas petition is set forth in 28 U.S.C. § 2244(d), which provides in pertinent part:

9

(1) A 1-year period of limitations shall apply to an
application for a writ of habeas corpus by a person in
custody pursuant to the judgment of a State court.  The
limitation period shall run from the latest of–

    (A) the date on which the judgment became final by
the conclusion of direct review or the expiration of
the time for seeking such review; ...

(2) The time during which a properly filed application
for State post-conviction or other collateral review
with respect to the pertinent judgment or claim is
pending shall not be counted toward any period of
limitation under this section.

Section 2244(d) became effective on April 24, 1996 when the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")

was signed into law.  See Burns v. Morton, 134 F.3d 109, 111 (3d

Cir. 1998); Duarte v. Herschberger, 947 F. Supp. 146, 147 (D.N.J.

1996).  The Third Circuit has ruled that state prisoners whose

convictions became final before the April 24, 1996 enactment of

AEDPA are permitted one year, until April 23, 1997, in which to

file a federal habeas petition under § 2254.  See Burns, 134 F.3d

at 111.  See also Lindh v. Murphy, 521 U.S. 320, 326-27

(1997)("[t]he statute reveals Congress' intent to apply the

amendments to chapter 153 only to such cases as were filed after

the statute's enactment").

Thus, pursuant to § 2244(d), evaluation of the timeliness of

a § 2254 petition requires a determination of, first, when the

pertinent judgment became "final," and, second, the period of

time during which an application for state post-conviction relief

was "properly filed" and "pending."

A state-court criminal judgment becomes "final" within the meaning of § 2244(d)(1) by the conclusion of direct review or by the expiration of time for seeking such review, including the 90-day period for filing a petition for writ of certiorari in the United States Supreme Court. See Swartz v. Meyers, 204 F.3d 417, 419 (3d Cir. 2000); Morris v. Horn, 187 F.3d 333, 337 n.1 (3d Cir. 1999); U.S. Sup. Ct. R. 13.

As noted above, where a conviction became final prior to April 24, 1996, the effective date of § 2244(d), a state prisoner has a one-year grace period after that effective date to file a § 2254 petition. Burns, 134 F.3d at 111. However, that limitations period is tolled during the time a properly filed application for state post-conviction relief is pending. 28 U.S.C. § 2244(d)(2). An application for state post-conviction relief is considered "pending" within the meaning of § 2244(d)(2), and the limitations period is statutorily tolled, from the time it is "properly filed,"[3] during the period between

_____

[3] An application is "properly filed" when its delivery and acceptance are in compliance with the applicable laws and rules governing filings. These usually prescribe, for example, the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee. In some jurisdictions the filing requirements also include, for example, preconditions imposed on particular abusive filers, or on all filers generally. But in common usage, the question whether an application has been "properly filed" is quite separate from the question whether the claims contained in the application are meritorious and free of procedural bar. Artuz v. Bennett, 531 U.S. 4, 8-9 (2000) (footnotes and citations omitted).

a lower state court's decision and the filing of a notice of appeal to a higher court, <u>Carey v. Saffold</u>, 536 U.S. 214 (2002), and through the time in which an appeal could be filed, even if the appeal is never filed, <u>Swartz v. Meyers</u>, 204 F.3d at 420-24. Nevertheless, "the time during which a state prisoner may file a petition for writ of certiorari in the United States Supreme Court from the denial of his state post-conviction petition does not toll the one year statute of limitations under 28 U.S.C. § 2244(d)(2)."   <u>Stokes v. District Attorney of the County of Philadelphia</u>, 247 F.3d 539, 542 (3d Cir.), <u>cert. denied</u>, 534 U.S. 959 (2001).

The limitations period of § 2244(d) is also subject to equitable tolling.   <u>Fahy v. Horn</u>, 240 F.3d 239, 244 (3d Cir.), <u>cert. denied</u>, 122 S.Ct. 323 (2001); <u>Jones v. Morton</u>, 195 F.3d 153, 159 (3d Cir. 1999); <u>Miller v. New Jersey State Dept. of Corrections</u>, 145 F.3d 616, 618 (3d Cir. 1998).[4]  However, the one-year limitations period in § 2244(d)(1) can only be equitably

---

[4]   Equitable tolling applies:

> only when the principles of equity would make the rigid application of a limitation period unfair.  Generally, this will occur when the petitioner has in some extraordinary way been prevented from asserting his or her rights.  The petitioner must show that he or she exercised reasonable diligence in investigating and bringing [the] claims.  Mere excusable neglect is not sufficient.

<u>Miller</u>, 145 F.3d at 618-19 (citations omitted).

12

tolled when a petitioner has "exercised reasonable diligence in investigating and bringing the claims." Miller, 145 F.3d at 618. Excusable neglect is insufficient; rather, petitioner must in some extraordinary way demonstrate that he was prevented from asserting his rights. Id. There are three enumerated circumstances that would permit equitable tolling in the instant case: (1) the petitioner has been actively misled; (2) the petitioner has been prevented from asserting his rights in some extraordinary way; or (3) the petitioner timely asserted his rights in the wrong forum. Jones, 195 F.3d at 159. The Third Circuit has expressly held that, in non-capital cases, attorney error, miscalculation, inadequate research, or other mistakes are not the extraordinary circumstances necessary to establish equitable tolling. Johnson v. Hendricks, 314 F.3d 159, 163 (3d Cir. 2002), cert. denied 538 U.S. 1022 (2003); Fahy, 240 F.3d at 244.

Among other things, the Court of Appeals for the Third Circuit has held that equitable tolling may be appropriate "if the plaintiff has timely asserted his rights mistakenly in the wrong forum," i.e., if a petitioner has filed a timely but unexhausted federal habeas petition. Jones, 195 F.3d at 159. See also Duncan v. Walker, 533 U.S. 167, 183 (2001) (Stevens, J., joined by Souter, J., concurring in part) ("neither the Court's narrow holding [that the limitations period is not statutorily

13

tolled during the pendency of a premature federal habeas petition], nor anything in the text or legislative history of AEDPA, precludes a federal court from deeming the limitations period tolled for such a petition as a matter of equity"); 533 U.S. at 192 (Breyer, J., dissenting, joined by Ginsburg, J.) (characterizing Justice Stevens's suggestion as "sound").

Here, a judgment of conviction and sentence was entered against Jackson on or about October 9, 1992, and after direct appeal, his judgment of conviction became final, pursuant to 28 U.S.C. § 2244(d)(1), on September 3, 1996, or 90 days after the New Jersey Supreme Court denied certification on direct appeal, which was June 5, 1996 (*i.e.,* conviction becomes final upon expiration of the 90-day period for filing a petition for writ of certiorari in the United States Supreme Court). See Swartz, 204 F.3d at 419; Morris, 187 F.3d at 337 n.1; U.S. Sup. Ct. R. 13. Thus, Jackson's state court conviction now under attack became final after the enactment of AEDPA on April 24, 1996. Consequently, Jackson had one year from September 3, 1996, or until September 3, 1997 to bring his federal habeas petition under § 2254.

Nevertheless, the Court also finds that there was statutory tolling of the limitations period under § 2244(d)(2) before September 3, 1997 because Jackson filed several state PCR applications, which remained pending in state court until May 8,

2003, when the New Jersey Supreme Court denied certification from the Appellate Division's January 3, 2003 Order re-affirming the trial court's denial of post-conviction relief.  Thus, Jackson's limitation period began to run from September 3, 1996 until April 22, 1997 (the date Jackson filed his first state PCR petition), for exactly 232 days.  At that point, the limitations period was tolled under § 2244(d)(2).

The State appears to argue that the limitations period did not begin to run again until May 8, 2003, when the New Jersey Supreme Court denied certification on the appeal from the PCR denial.  Thus, Jackson had only 133 days (*i.e.,* one year or 365 days minus the 232 days which had already run) from May 8, 2003, or until September 18, 2003, to file his federal § 2254 petition. See Stokes, 247 F.3d at 542 (the "time during which a state prisoner may file a petition for writ of certiorari in the United States Supreme Court from the denial of his state post-conviction petition does not toll the one year statute of limitations under 28 U.S.C. § 2244 (d)(2)").  Jackson did not file his § 2254 habeas petition until April 30, 2004, almost seven months after the statutory period had allegedly expired.

However, this Court finds that the statutory tolling remained in effect because, on February 13, 2003, Jackson had filed a PCR petition in state court seeking DNA testing, which was still pending at the time Jackson filed this federal habeas

15

petition on or about April 30, 2004.[5]  The State contends that,
since Jackson does not include any grounds in this petition for
habeas relief regarding the DNA testing, the limitations period
should not be tolled from the motion and appeal on that issue.[6]
The Court rejects this argument based on the Third Circuit's
ruling in Sweger v. Chesney, 294 F.3d 506 (3d Cir. 2002), cert.
denied, 538 U.S. 1002 (2003).  In Sweger, the Third Circuit held
that § 2244(d)(1) must be applied to a habeas petition as a whole
and not on a claim-by-claim basis.  294 F.3d at 514-15, 517.  The
Third Circuit extended this interpretation to § 2244(d)(2), by
stating that "[a]ny properly filed collateral challenge *to the*
*judgment* tolls the time to seek federal collateral review."  Id.
at 517 (quoting Carter v. Litscher, 275 F.3d 663, 665 (7th Cir.
2001)).  Therefore, the action is not time barred, and the
State's affirmative defense is rejected.

---

[5]  The motion was denied on June 13, 2003, but petitioner
appealed and that appeal was pending at the time Jackson filed
his habeas petition and when the State responded to the petition.

[6]  The State relies on Austin v. Mitchell, 200 F.3d 391 (6th
Cir. 1999), which has since been overruled by Cowherd v. Million,
380 F.3d 909 (6th Cir. 2004), and rejected by the Third Circuit
in Sweger v. Chesney, 294 F.3d 506 (3d Cir. 2002), cert. denied,
538 U.S. 1002 (2003).

## V.   ANALYSIS OF CLAIMS[7]

### A.   Exhaustion Requirement

Next, the State contends that several of Jackson's claims are not exhausted and the petition should be dismissed accordingly.  In particular, the State cites the following grounds as unexhausted: Petitioner's "Ground 2" (in which Jackson claims that the state court findings cannot be used)[8]; "Ground 4" (in which Jackson claims that the aggravating factors pertaining to the death penalty were not presented to the grand jury pursuant to State v. Fortin, 178 N.J. 540 (2004)); and "Ground 6"

---

[7]   Ground 1 of the petition states that the claims asserted by petitioner have been exhausted in state court.  For the reasons stated in this Opinion, infra, at pages 15-16, the Court will not address this first ground individually.  In Ground 3 of the petition, Jackson invokes the "mailbox rule" to have his petition ruled upon as timely filed.  Since the Court has determined that the petition is not time-barred, this ground need not be discussed.  See also this Opinion at fn. 2, pg. 5.  There is no Ground 7 in the petition.  The remaining grounds will be discussed on the merits in this Opinion, infra.

[8]   Ground 2 will be dismissed because Jackson fails to state a claim for federal habeas relief.  Jackson asserts that there were "instances, and conclusions were reached by different State Courts that made the factual record irreconcilable." (Petition, Ground 2).  He provides no support for this bald claim, but states that he will do so in his forthcoming Traverse.  Jackson filed his Traverse on or about September 8, 2005, but there are no allegations or factual support recited in the Traverse to support this claim.  Further, this Court's review of the state court record did not reveal any factual inconsistencies in the state court rulings.  Therefore, the Court rejects Jackson's claim that the state court record is "totally unreliable and unreasonable."

17

(in which Jackson claims that the State's decision to pursue the death penalty was based on racial factors).

It is well established that a state prisoner applying for a writ of habeas corpus in federal court must first "exhaust[] the remedies available in the courts of the State," unless "there is an absence of available State corrective process[] or ... circumstances exist that render such process ineffective ... ." 28 U.S.C. § 2254(b)(1); see also 28 U.S.C. §2254(c); Rose v. Lundy, 455 U.S. 509, 510 (1982); Johnson v. Pinchak, 392 F.3d 551, 556 (3d Cir. 2004), cert. denied, 126 S.Ct. 370 (Oct. 3, 2005). A petitioner exhausts state remedies by presenting his federal constitutional claims to each level of the state courts empowered to hear those claims, either on direct appeal or in collateral post-conviction proceedings. See, e.g., O'Sullivan v. Boerckel, 526 U.S. 838, 847 (1999) ("requiring state prisoners [in order to fully exhaust their claims] to file petitions for discretionary review when that review is part of the ordinary appellate review procedure in the State"); Lambert v. Blackwell, 134 F.3d 506, 513 (3d Cir. 1997) (collateral attack in state court is not required if the petitioner's claim has been considered on direct appeal), cert. denied, 532 U.S. 919 (2001); 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the

18

law of the State to raise, by any available procedure, the question presented.")  Once a petitioner's federal claims have been fairly presented to the state's highest court, the exhaustion requirement is satisfied.  Castille v. Peoples, 489 U.S. 346, 350 (1989); Picard v. Connor, 404 U.S. 270, 275 (1971).

The petitioner generally bears the burden to prove all facts establishing exhaustion.  Toulson v. Beyer, 987 F.2d 984, 987 (3d Cir. 1993).  This means that the claims heard by the state courts must be the "substantial equivalent" of the claims asserted in the federal habeas petition.  Picard, 404 U.S. at 275.  Reliance on the same constitutional provision is not sufficient; the legal theory and factual basis must also be the same.  Id. at 277.

Here, the State asserts that certain claims raised by Jackson in this federal habeas action are unexhausted.  However, to the extent any of the claims were not exhausted in state court, this Court may opt to review such claims, and deny them on the merits pursuant to 28 U.S.C. § 2254(b)(2).  Section 2254(b)(2) provides that "[a]n application for writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  Here, the respondents have fully addressed each of petitioner's claims on the merits.  Thus, for the reasons discussed below, the Court will deny this petition on the merits, pursuant to 28 U.S.C. § 2254(b)(2), because "it is perfectly

clear that an applicant does not raise even a colorable federal claim." Lambert, 134 F.3d at 514-15.

B.  Prosecutor's Decision to Seek Death Penalty Was Arbitrary
    and Capricious and Warrants a Reversal of Conviction

In Ground Four of his Amended Petition (Docket Entry Nos. 6 and 10), Jackson asserts that the prosecutor's decision to seek the death penalty was arbitrary and capricious.  He also argues that every element of the alleged offense, such as the aggravating factors pertaining to a capital murder offense, must be presented to the Grand Jury and included in the indictment. Further, referring to State v. Jackson, 118 N.J. 484, 492-93 (1990), Jackson contends that since he did not plead to capital murder on his re-trial, he should have been re-indicted.

Jackson expanded on this claim in Ground Five of his Amended Petition.  He claims that his indictment should be dismissed and the matter remanded because he was denied the fair opportunity to have the Grand Jury consider the aggravating factors pertaining to a capital murder offense and determine whether an indictment for a capital crime should have been issued pursuant to State v. Fortin, 178 N.J. 540 (2004).

The State argues that these claims were not exhausted in state court proceedings, that the claims are moot since the death penalty was not imposed, and that the New Jersey Supreme Court's ruling in Fortin was to be applied prospectively.  Fortin, 178 N.J. at 647, 650 ("Our holding today applies *only* to those cases

20

that have yet to reach the penalty-phase.")[emphasis in original].  Further, the prosecutor's decision to pursue the death penalty was not arbitrary and capricious, as the reasons for pursuing the death penalty were set forth pursuant to the guidelines for designating homicide cases for capital prosecutions in the prosecutor's May 30, 1992 memorandum. (Respondents' Exhibit 1, Prosecutor James W. Holzapfel Memorandum dated May 30, 1992).

This Court finds that Jackson's claims respecting the prosecutor's pursuit of the death penalty and whether the aggravating factors relating to a capital case should have been presented to a Grand Jury are moot because the death penalty was not imposed by the jury in the penalty phase at re-trial. Accordingly, habeas relief on these grounds will be denied.

C.  <u>Petitioner's Capital Prosecution Was Racially Motivated</u>

Next, in Ground Six and Ground 11 of the Amended Petition, Jackson contends that his prosecution under the death penalty was motivated by the fact that he is a Black defendant and the victim was White.  He claims that he was denied due process and equal protection and a fair trial because of the racial bias apparent during both trials.  He seeks a remand and re-trial.

This Court's careful review of the state court record below fails to reveal any facts to support the claims of racial bias infecting Jackson's prosecution.  Jackson fails to provide any

factual substantiation for these bald claims of racial bias.
Therefore, the Court finds no substantive merit to petitioner's
claim, and habeas relief will be denied accordingly.

D.   Petitioner's Confession Should Have Been Suppressed

     1.   *"Fruit" of an Illegal Arrest.*

     In Ground Eight of the Amended Petition, Jackson asserts
that his confession was unlawfully obtained pursuant to an
illegal arrest and should have been suppressed as "fruit" of that
illegal arrest.  Jackson raised this claim in his state PCR
proceedings.  Specifically, with regard to whether the arrest was
lawful, the PCR court found:

> I find as a fact that the arrest was not illegal.  I find as
> a fact that the police went there lawfully, investigating a
> crime.  They had information lawfully, and reason to believe
> that Mr. Jackson had been seen operating a motor vehicle
> owned by the victim of a homicide.  They questioned him.
>
> During that questioning, which was lawful and legal, they
> learned and had probable cause to believe that he in fact
> was operating that motor vehicle.  And they placed him under
> arrest for the theft of that motor vehicle.
>
> The questioning and the searching that followed that arrest
> were for possession of that stolen motor vehicle.  And the
> search ... [was] incident to a lawful arrest, not an
> unlawful arrest, not an illegal arrest, but an arrest that
> was lawfully made, based upon probable cause.

(Resp. Ex. 132, PCR Transcript, dated August 25, 2000, 13:9-
14:2).

     On appeal from denial of the PCR petition, the Appellate
Division affirmed, finding that the claim lacked merit.  (Resp.
Ex. 40, November 13, 2002 per curiam Appellate Division Opinion).

This Court finds that Jackson's arrest was lawfully made, based upon probable cause.  The police went to Jackson's apartment to question him with regard to his use of the victim's car.  In their investigation of the murder, the police had learned from an individual that Jackson had been driving the victim's car the night after the murder.  It was about 3:00 a.m. in the morning.  The police officers knocked at Jackson's apartment door, and Jackson answered promptly.  He appeared to be wide awake.  There was no forcible entry, and Jackson had allowed the officers to enter his apartment.  When Jackson did not respond to the police officer's questions about the car, he was arrested.  Jackson had to get dressed, and the police took Jackson to the Lakewood Police Headquarters after administering his <u>Miranda</u> rights.  (<u>See</u> Resp. Ex. 95, June 22, 1992 Trial Transcript, 6:8-7:13).

The trial court made the following factual findings with respect to <u>Miranda</u> hearing, and the police officer's testimony regarding the arrest of Jackson:

> Under cross-examination the officer testified that he had worked continuously from the time the body was first discovered until he saw the defendant, that they had compiled certain information that made them consider the defendant a suspect, at least with regard to the theft of the automobile, that they were led to the defendant through the defendant's employer who provided the name and address from their records.
>
> He also stated that they had no other suspect, and that their initial questions involved the motor vehicle and how the defendant had come into possession of it.

23

He also testified that he and four other officers responded
to the defendant's residence, and that they watched all of
the windows and doors to the apartment to insure that no one
left the building when they knocked on the front door.  He
said that initially they had two purposes in mind when they
went to his home: The first was to question the defendant to
determine whether or not he had a legitimate reason for
having possession of the motor vehicle; and secondly, to
arrest him in the event that no valid explanation was given
with regard to why he had possession of the automobile.

He testified initially that the defendant refused to answer
any questions while at his residence, that he failed to
provide them with an explanation of why he had the motor
vehicle, and they placed him under arrest.

He also stated that Sergeant Russell was the first one to
speak to the defendant and asked him if he was Kevin
Jackson, in addition to asking him questions about the motor
vehicle.  They told the defendant that he had been seen in
the motor vehicle and that then the defendant backed away
from the door when they arrived and was sullen and
uncooperative.  He described the defendant as ignoring the
fact that they were there and testified that he did not draw
his own weapon and did not see anyone else draw their
weapon.

The initial questions were given to the defendant in the
living room area, which is where he traveled from the front
door after he opened it.  The defendant was allowed to dress
and then he was taken down to police headquarters.  His
hands were handcuffed in front of him and a uniformed police
officer watched the defendant while he dressed.

The only questions asked of the defendant were posed by
Detective Sergeant Russell and Detective Mohel.  Both
officers explained to the defendant that he was under
arrest, and within five minutes, he was placed in the police
motor vehicle.

(Resp. Ex. 95, June 22, 1992 Trial Transcript, 9:18-11:13).

Based on the record, this Court finds nothing to indicate

that the state trial court and the PCR court decisions on this

issue were based on an unreasonable application of the facts in

24

light of the evidence presented at trial and at the PCR hearing.
Nor were the courts' decisions contrary to established federal
law.[9]  Jackson has not demonstrated that the state court
decision, when evaluated objectively and on the merits, resulted
in an outcome that cannot be reasonably justified.  Matteo, 171
F.3d at 891.  Accordingly, this claim will be denied for lack of
substantive merit.

_____

    [9]  In his PCR proceedings, Jackson's counsel had argued that
the arrest was illegal, and anything obtained pursuant to that
arrest must be suppressed, based on Payton v. New York, 445 U.S.
573 (1980)(holding that police are prohibited from making a
warrantless and non-consensual entry into a suspect's home in
order to make a felony arrest).  The factual circumstances
relating to the arrests at issue in Payton are very different
from this case.  In Payton, the police had used a crow bar to
enter Payton's residence after two days of an intense
investigation where the police had assembled evidence sufficient
to establish probable cause to believe that Payton had murdered
the manager of a gas station.  No one was home, but in plain view
was a .30-caliber shell casing which the police seized.  In the
second case at issue in Payton, the defendant Riddick was
arrested by police in March 1974 for two armed robberies
occurring in 1971.  He had been identified to the police by
victims in June 1973, and in January 1974, the police had learned
Riddick's address.  They went to the place where Riddick was
living and Riddick's young son answered the door.  Riddick was
seen in his bed covered by a sheet.  The police entered the home
without permission and placed Riddick under arrest.  Before
allowing Riddick to dress, the police proceeded to search the
surrounding area near Riddick for weapons and narcotics.  In
contrast here, Jackson willingly allowed the police to enter his
apartment, and they did not search the apartment upon his arrest
to obtain evidence to use against him.  Further, there was no
indication until after the police spoke with Jackson at his
apartment that an arrest warrant would be needed.  Rather, the
police were simply conducting a continuing investigation and it
was not until Jackson failed to cooperate that they arrested him
for theft of the victim's car.  Given these circumstances of
arrest, this Court does not find Payton applicable here.

2.  *The Confession Was Voluntary*

Jackson also contends that his confession should be suppressed because it was not given voluntarily.  A <u>Miranda</u> hearing was conducted on June 12, 1992, and the only testimony heard was that from Investigator Michael Mohel of the Ocean County Prosecutor's Office.  The trial court made a ruling on June 22, 1992, and found the <u>Miranda</u> warnings were given to Jackson and that Jackson waived his rights knowingly and voluntarily prior to making his statement.  The court also ruled that the totality of the circumstances surrounding the confession showed the statement to be voluntarily given by petitioner.  The court further stated that the State had sustained its burden of proving that the police had complied with the procedures required by <u>Miranda</u>.  Moreover, there was no evidence that Jackson had intended to "cut off the questioning" as in <u>Michigan v. Moseley</u>, 423 U.S. 96 (1975), or that petitioner had asserted his right to remain silent by saying he "had nothing else to say" or that he "does not want to talk about the crime," as in <u>State v. Johnson</u>, 120 N.J. 263 (1990).  Jackson made no similar utterance or comment.  (Resp. Ex. 95, June 22, 1992, 17:3-23).

In particular, the court ruled:

This Court finds that there was a proper recitation of the defendant's rights followed by a valid waiver which is, in fact, signed by defendant.

It also finds that the State has met its burden of demonstrating that there was, under the totality of the

26

> circumstances, a knowing and intelligent waiver of his Fifth
> Amendment Right to have counsel present during interrogation
> and have his right to remain silent.
>
> There is no evidence of police coercion from his conduct or
> extended interrogation to wear down the defendant's will.
>
> The confession itself also sheds some light on the issue.
> In his own voice we heard him state "Yes" in response to the
> fact that he had been advised of his constitutional rights
> by Detective Sergeant Russell.
>
> He was also shown his Waiver of Rights form, and he
> confirmed on the tape that it was read to him.  He also said
> that in response to a question: "Are you willing to give us
> a voluntary and truthful statement concerning this matter?"
> He stated "Yes."
>
> In response to the question "No one present has threatened
> or mistreated you in any way to obtain this statement?"  The
> answer was "No."

(Id. at 18:14-19:11).

On direct appeal, the Appellate Division affirmed the trial

court's determination in admitting Jackson's confession.  The

court stated:

> After a lengthy pretrial hearing, the court heard argument
> concerning whether defendant's custodial statement to police
> followed a voluntary and knowing waiver of his right to
> remain silent.  The court found that defendant was arrested
> by several officers, at least one of whom was in uniform,
> that defendant was advised of his rights when arrested and
> again less than one-half hour later in the police station,
> and that defendant repeatedly indicated he understood his
> rights as recited in accordance with Miranda v. Arizona, 384
> U.S. 436, 86 S.Ct. 1602, 16 L.Ed 2d 694 (1966).  The court
> concluded that defendant waived those rights in writing,
> voluntarily and knowingly, before giving his taped
> confession, after which he signed a typed transcription of
> that confession.
>
> At the pretrial hearing defendant contended, as he does on
> appeal, that "when he put his head down after being
> confronted with the fact that Dr. Hussey [his roommate]

27

> would not confirm they were together on the night of Miss
> Levithan's death, that those were indications he no longer
> wanted to speak to the officers."  Finding the police
> witnesses very credible, the court concluded that defendant
> was properly advised of his rights and waived them, and that
> "there was and is no evidence that the defendant intended to
> 'cut off the questioning' the way it was cut off in [cases
> finding a Miranda violation]."  In sum, there was
> "absolutely no basis to conclude that there is any merit to
> ... the claim made by the defense" in support of suppressing
> defendant's statement.

(Appellate Division Opinion dated February 29, 1996, at pages 20-

21).

     Jackson raised this argument again in his state PCR

proceedings, based on a then-recent New Jersey Supreme Court

case, State v. Chippero, 164 N.J. 342 (2000).  The PCR court

rejected the claim, finding that:

> This was not an involuntary confession.  This is not like
> the Chippero case, where that defendant, over a period of
> nine hours in custody, repeatedly said, "I want to talk to a
> lawyer;" where, in the Chippero case, his mother said to the
> police officers, while she was outside the interrogation
> room while he was in custody, said, "I will get a lawyer."
>
> The police officers in that case talked her out of getting a
> lawyer, and said, "He doesn't need a lawyer," clearly a
> violation of our constitution.
>
> ...
>
> I find as a fact that the statement and the confession made
> by Mr. Jackson in this case is in no way similar to the
> facts in Chippero. ...
>
> This case is nothing like that.  In this case, there is no
> violation of Mr. Jackson's constitutional rights with regard
> to the admissibility of this confession.

(Resp. Ex. 132, PCR Transcript, dated August 25, 2000, 14:21-

16:2).  The Appellate Division affirmed the denial of the PCR

petition, without discussion, for the reasons cited in the PCR court's oral decision rendered on August 25, 2000.  (Resp. Ex. 40).

In Miranda, the Supreme Court held that in order to protect an accused's Fifth Amendment right against self-incrimination during the inherently coercive custodial interrogation setting, certain procedural safeguards must be employed.  These safeguards include the explicit warning that the accused "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires." Miranda, 384 U.S. at 479.

Miranda also provides that the accused may waive his rights, but must do so "voluntarily, knowingly and intelligently".  Id. at 475.  In determining whether there has been a valid waiver of Miranda rights, a court must conduct a two-part inquiry under a totality of the circumstances standard.  Moran v. Burbine, 475 U.S. 412, 421 (1986).  First, the court looks to the voluntariness of the statement, and whether the waiver was freely and deliberately given as opposed to being obtained by coercion, intimidation, or deception.  Id.  Second, the court must consider whether the waiver was "knowingly and intelligently" made, that is, whether the accused was fully aware "both of the nature of

29

the right being abandoned and the consequences of the decision to abandon it."  Id.

The "totality of the circumstances" approach is the clearly established federal standard applied to determine whether there has been a voluntary waiver of Miranda rights.  A court must take into account "both the characteristics of the accused and the details of the interrogation."  Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).  This approach includes the evaluation of the subject's age, education, experience, background, and intelligence, and whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights, the length of detention, the repeated and prolonged nature of questioning, and the use of physical punishment such as the deprivation of food or sleep.[10]  Id.; see also Fare v. Michael C., 442 U.S. 707, 725 (1979); United States v. Swint, 15 F.3d 286, 289 (3d Cir. 1994). It looks to the person's familiarity with the criminal justice system, the timing of the Miranda warnings and the statement given, and the length and nature of the interrogation and the

---

[10]  In determining the voluntariness of the confession, New Jersey state courts have traditionally assessed the totality of the circumstances surrounding the arrest and interrogation, including such factors as the accused's "age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment of mental exhaustion was involved."  State v. Miller, 76 N.J. 392, 402 (1978); see also State v. Presha, 163 N.J. 304, 313 (2000).

accompanying detention.  See United States v. Velasquez, 885 F.2d 1076, 1086 (3d Cir. 1989), cert. denied, 494 U.S. 1017 (1990); United States v. Vasquez, 889 F. Supp. 171, 177 (M.D.Pa. 1995). See also Yarborough v. Alvarado, 541 U.S. 652, 124 S.Ct. 2140, 2151 (2004)(the characteristics of the defendant can include the defendant's age, education, and intelligence, as well as his prior experience with law enforcement).

Further, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Colorado v. Connelly, 479 U.S. 157, 167 (1986); see also Arizona v. Fulminante, 499 U.S. 279, 288 (1991)(a statement is involuntary when the suspect's "will was overborne in such a way as to render his confession the product of coercion"); Lam v. Kelchner, 304 F.3d 256, 264 (3d Cir. 2002).  Absent police overreaching, which is causally related to the confession, "there is simply no basis for concluding that a state actor has deprived a criminal defendant of due process of law." Connelly. 479 U.S. at 164.  Thus, beyond the necessary and crucial element of police coercion, courts look to both the characteristics of the accused and the circumstances of the interrogation in considering whether a confession is voluntary.  See, e.g., Withrow v. Williams, 507 U.S. 680, 693-94 (1993)(concluding that the voluntariness of the confession depends upon the totality of circumstances, including

31

police coercion, length and place of interrogation, the accused's
maturity, education, physical condition, intelligence, and mental
health, as well as 'the failure of the police to advise the
defendant of his rights to remain silent and to have counsel
present during the custodial interrogation"); Scneckloth, 412
U.S. at 226 (the voluntariness of a statement may often depend on
whether the accused's will was overborne, a question that
logically turns on the characteristics of the accused).  The
government "need prove waiver only by a preponderance of the
evidence."  Connelly, 479 U.S. at 168.

This Court has carefully reviewed the record and finds that
the totality of the circumstances in this case clearly weigh in
favor of voluntariness, as determined by the trial court and the
PCR court.  First, there is no evidence of coercive conduct on
the part of the officers.  Jackson was read his rights upon his
arrest, and again immediately before his interrogation.  His
confession was given shortly after the interrogation, when he was
told that his roommate would not corroborate his alibi.  Jackson
was interrogated for no more than 3 hours in which time he gave
his confession.  There was no evidence or testimony that Jackson
was deprived of food, sleep, or other physical needs that would
otherwise serve to overbear a person's will.

Next, there were no factors concerning Jackson's age, mental
condition, or education, which suggested that he did not

understand his Miranda rights or the consequences of waiving those rights.  In this regard, Jackson argues that he did have a psychological condition that impaired his ability to understand and knowingly waive his Miranda rights.  He contends that his expert Neuro-Psychologist, Dr. Mack, had examined petitioner and found evidence of a brain impairment.  This impairment made him "psychologically unable to cope with the custodial and interrogative situation relevant to the Miranda hearing." (Amended Petition at pg. 13).  Jackson further argues that his counsel was ineffective in failing to call Dr. Mack to testify on this issue at the Miranda hearing, since such testimony would have proven that Jackson did not give a voluntary confession. (Id.).

This issue was raised in Jackson's state PCR proceedings. At the PCR proceedings, Jackson's counsel argued that petitioner's act of putting his head down on the table during the interrogation before he confessed to the murder indicated that Jackson did not wish to talk and was invoking his Miranda rights to remain silent and have a lawyer present.  The PCR court found this claim to be "poppycock" for lack of a better legal term. (Resp. Ex. 132, August 25, 2000 PCR Transcript, 16:9-24).  The court further noted that the issue of Jackson's psychological impairment was presented to the jury during trial and the jury found "beyond a reasonable doubt that Mr. Jackson did not suffer

from a mental disease or disorder that affected his ability to act purposely or knowingly." (Id., PCRT 17:2-8).

Further, the court noted that Jackson put his head down on the table after he was told that his alibi witness would not corroborate his story. The court found this action to be nothing more than a reaction to being caught in a lie. Specifically, the court stated:

> He got caught in a lie, and he was disappointed. I don't
> need a psychologist to tell me, and I respectfully suggest
> there's not a court in the world that needs a psychologist
> to tell them, that that reaction means, "I don't want to
> talk anymore, I don't want to make a confession, I need to
> talk to a lawyer," when it's already been determined by the
> trial court that this was a knowing, voluntary,
> understanding of his constitutional rights, not once, not
> twice, not three times, but at least four times, possibly
> five times, either by having it read to him, stated to him,
> or an opportunity to read it himself.
>
> And I can state unequivocally, by the pleadings, Mr. Jackson
> is not an inarticulate, uneducated man. He's articulate,
> he's educated, he clearly can read and write and understand
> the English language, and I find that as a fact, and an
> opportunity to read the rights waiver form in this case and
> the Miranda card, which are printed in plain English,
> probably at about a sixth-grade reading level and
> understanding level, so that almost everybody that can read,
> even at the lowest common level, can understand those
> written words, knew what his rights were.

(Id., PCRT 18:4-19:1).

The court also rejected the ineffectiveness of counsel claim on this issue:

> And I can't imagine any minimally competent defense
> attorney, or even the most competent defense attorney,
> imagining in his wildest dreams that we should waste the
> Court's time, waste the money or the effort to bring the
> psychologist into the Miranda hearing, for several reasons.

34

> Number one, it's a ridiculous argument.  Number 2, what does
> it do from a strategy perspective when you put your expert
> on the stand and give the prosecutor a free shot at to know
> exactly what he is going to say before he goes in front of
> the jury?
>
> That might even be incompetency of counsel, to take your
> best hope of convincing a jury of twelve people, and then
> you shoot your wad by, out of the presence of the jury,
> giving a very experienced prosecutor an opportunity to chew
> your expert to pieces and know exactly what he's going to
> say.

(Id., PCRT 19:19-20:10).  Considering the petitioner's argument

under both prongs of the Strickland standard, see this Opinion,

infra at pages 39-42, the PCR court found no incompetency of

counsel.[11]  Consequently, based on the record and the relevant

law, this Court finds no psychological impairment or condition to

suggest that Jackson's waiver of his Miranda rights and his

confession was involuntary or unknowing.

Next, the Court finds no overreaching or objectively

coercive police conduct that would have overborne petitioner's

will under the circumstances here to make Jackson's waiver

involuntary.  There simply was no constitutionally impermissible

conduct by the police during the short interrogation that would

impugn the voluntariness of Jackson's confession.  As stated

above, there were no physical punishments inflicted on petitioner

---

[11]  The Court will review this ineffective assistance of
counsel claim more thoroughly in the next section of this
Opinion.

– he was not deprived of sleep and food and he was not physically threatened or harmed.  The interrogation was short in duration.

Moreover, there is no suggestion that the police used unnecessary or overbearing psychological tactics to extract a confession from Jackson.  At most, the police informed Jackson that his roommate would not corroborate his alibi.  (It was after this point that Jackson gave a statement as to his involvement in the murder).  During the course of an interrogation, it is generally recognized that the police may use some psychological tactics in eliciting statements from a suspect.  See Frazier v. Cupp, 394 U.S. 731, 739 (1969)(police misrepresentation to defendant that the co-defendant had confessed was not sufficient to make the otherwise voluntary confession inadmissible); Miller v. Fenton, 796 F.2d 598, 605 (3d Cir.), cert. denied, 479 U.S. 989 (1986); State v. Jacks, 634 F.2d 390, 393 (8th Cir.), cert. denied, 450 U.S. 934 (1981)(representation that cooperation would promote leniency, although no actual promise was made).  The police may "attempt to create a climate which would be conducive to extracting inculpatory information."  Id.

Consequently, after careful review of the record, the trial court's findings at the Miranda hearing, the Appellate Division ruling, and the PCR court's findings, this Court cannot conclude that the determination of the trial court in admitting Jackson's statement resulted in a decision that was contrary to, or

involved an unreasonable application of clearly established
federal law, or resulted in a decision that was based on an
unreasonable determination of the facts in light of the evidence
presented in the state court proceeding.  Williams v. Taylor,
supra.  The state courts applied the correct law and facts in
reaching its determination that there was no Miranda violation,
and that the statement was voluntarily and knowingly given by
Jackson.  Jackson has failed to demonstrate that the state court
opinion, when evaluated objectively and on the merits, resulted
in an outcome that cannot be reasonably justified.  Matteo, 171
F.3d at 891.  Therefore, the Court will deny federal habeas
relief on this claim because the alleged violation of
petitioner's Fifth Amendment rights is substantively meritless.

E.   Ineffectiveness of Counsel Claim

     The "clearly established Federal law, as determined by the
Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), is
the standard for ineffective assistance of counsel as enunciated
in Strickland v. Washington, 466 U.S. 668 (1984).  Under
Strickland, a petitioner seeking to prove a Sixth Amendment
violation must demonstrate that his counsel's performance fell
below an objective standard of reasonableness, assessing the
facts of the case at the time of counsel's conduct.  Id. at 688-
89; Jacobs v. Horn, 395 F.3d 92, 102 (3d Cir. 2005); Keller v.
Larkins, 251 F.3d 408, 418 (3d Cir.), cert. denied, 534 U.S. 973

(2001).  Counsel's errors must have been "so serious as to
deprive the defendant of a fair trial, a trial whose result is
reliable."  <u>Strickland</u>, 466 U.S. at 688.  "In any case presenting
an ineffectiveness claim, the performance inquiry must be whether
counsel's assistance was reasonable considering all the
circumstances."  <u>Id.</u>  The Supreme Court further explained:

> Judicial scrutiny of counsel's performance must be
> highly deferential.  It is all too tempting for a
> defendant to second-guess counsel's assistance after
> conviction or adverse sentence, and it is all too easy
> for a court, examining counsel's defense after it has
> proved unsuccessful, to conclude that a particular act
> or omission of counsel was unreasonable.  A fair
> assessment of attorney performance requires that every
> effort be made to eliminate the distorting effects of
> hindsight, to reconstruct the circumstances of
> counsel's challenged conduct, and to evaluate the
> conduct from counsel's perspective at the time.
> Because of the difficulties inherent in making the
> evaluation, a court must indulge a strong presumption
> that counsel's conduct falls within the wide range of
> reasonable professional assistance; that is, the
> defendant must overcome the presumption that, under the
> circumstances, the challenged action "might be
> considered sound trial strategy."

<u>Id.</u> at 689 (citations omitted); <u>see also</u> <u>Virgin Islands v.</u>
<u>Wheatherwax</u>, 77 F.3d 1425, 1431 (3d Cir.), <u>cert.</u> <u>denied</u>, 519 U.S.
1020 (1996).

    If able to demonstrate deficient performance by counsel,
petitioner must also show that counsel's substandard performance
actually prejudiced his defense.  <u>Strickland</u>, 466 U.S. at 687.
Prejudice is shown if "there is a reasonable probability that,
but for counsel's unprofessional errors, the result of the

proceeding would have been different.  A reasonable probability
is a probability sufficient to undermine confidence in the
outcome." Id. at 694.  The reviewing court must evaluate the
effect of any errors in light of the totality of the evidence.
Id. at 695-96.  Thus, the petitioner must establish both
deficient performance and resulting prejudice in order to state
an ineffective assistance of counsel claim.  Id. at 697.  See
also Jacobs, 395 F.3d at 102; Keller, 251 F.3d at 418.

Here, Jackson makes several claims asserting that counsel
was ineffective in representing him at trial.  First, as
mentioned above, Jackson contends that his trial counsel was
ineffective in failing to call Dr. Mack as a neuro-psychological
expert at the Miranda hearing.  Second, he complains that counsel
failed to inform Jackson that he had a right to testify in the
guilt phase of his trial.[12]

---

[12]  Jackson also makes a general claim that his appellate
counsel was ineffective for not raising these claims of
ineffective assistance of trial counsel on appeal.  The Supreme
Court has held that the Due Process Clause of the Fourteenth
Amendment guarantees a defendant the effective assistance of
counsel on a first direct appeal as of right.  Evitts v. Lucey,
469 U.S. 387 (1985).  Claims of ineffective assistance of
appellate counsel are evaluated under the Strickland standard.
See Lewis v. Johnson, 359 F.3d 646, 656 (3d Cir. 2004); Wright v.
Vaughn, 2004 WL 1687865, *6, n.10 (E.D. Pa. July 26, 2004).
Appellate counsel does not have a duty to advance every
nonfrivolous argument that could be made, see Jones v. Barnes,
463 U.S. 745, 754 (1983), but a petitioner may establish that
appellate counsel was constitutionally ineffective "if he shows
that counsel omitted significant and obvious issues while
pursuing issues that were clearly and significantly weaker."
Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994).

1.  *Failure to Call Dr. Mack at the Miranda Hearing*

This claim was addressed at Jackson's state PCR proceedings. The PCR court rejected the argument as "ridiculous".  In reaching this determination, the PCR court followed the United State Supreme Court standard set forth in Strickland.  As to the first prong on deficiency of performance, the court found that it was a strategic decision not to call Dr. Mack at the Miranda hearing because it would have given a competent prosecutor a "free shot" before trial to know exactly how the expert will testify before a jury and what he will say.  Indeed, the PCR court commented that

---

Moreover, in order to prevail on a claim that appellate counsel was ineffective, a petitioner must show not only that counsel's performance fell below an objective standard of reasonableness, but also that there was a reasonable probability, but for counsel's deficiency in raising the arguments on appeal, that the conviction would have been reversed on appeal.  See Buehl v. Vaughn, 166 F.3d 163, 173-74 (3d Cir. 1999), cert. dismissed, 527 U.S. 1050 (1999).

Based on review of the record, this Court finds that petitioner fails to establish deficient performance by appellate counsel.  Claims asserting ineffective assistance of counsel, such as asserted by petitioner here, are not typically raised on direct appeal because it requires the appellate court to look beyond the bounds of the record and the evidence presented at trial.  Moreover, petitioner fails to demonstrate how the alleged failure by appellate counsel to raise these claims on direct appeal would have had any reasonable potential for affecting the outcome of the appeal.  Indeed, the claims were raised in the state PCR proceedings and rejected out of hand, indicating that said claims would not have been successful even if they had been raised on direct appeal.  Therefore, this Court cannot conclude that the determination of this issue concerning appellate counsel by the state courts resulted in a decision that was contrary to, or involved an unreasonable application or determination of law or fact.  Williams v. Taylor, supra.  The ineffective assistance of appellate counsel claim will be denied accordingly.

petitioner's suggested strategy to call the expert to testify
before trial would have constituted incompetency of counsel
(Resp. Ex. 132, PCRT 19:19-20:25).

On the second prong, the PCR court held that there was no
likelihood that "a different attorney would have changed and
resulted in a different outcome at the end of trial."  (<u>Id</u>., PCRT
20:11-21:1).  The court's decision on these grounds were affirmed
on appeal from the state court's denial of the PCR petition.

This Court likewise finds that Jackson fails to prove either
prong of the two-part <u>Strickland</u> test on this claim of
ineffectiveness of trial counsel.  Counsel's decision was plainly
a strategic one, which should be accorded a strong level of
deference.  <u>Strickland</u>, 466 U.S. at 689, 690-91 ("[S]trategic
choices made after thorough investigation of law and facts
relevant to plausible options are virtually unchallengeable").
Rather, counsel would have been incompetent had he decided to
call Dr. Mack at the <u>Miranda</u> hearing because the prosecutor would
have been given a golden opportunity to hear and discredit the
expert witness before the witness testified in front of a jury.
Thus, counsel' performance was not deficient in failing to call
expert Dr. Mack at the <u>Miranda</u> hearing.  This decision by trial
counsel may be considered reasonable strategy, based on an
informed decision by counsel, which should be accorded a strong
level of deference under <u>Strickland</u>.

41

Further, as to prejudice, there was no guarantee that had Dr. Mack testified at the <u>Miranda</u> hearing that the confession would have been deemed involuntary.  Indeed, based on the PCR court's findings as to Jackson giving a knowing a voluntary confession after hearing, reading, understanding and waiving his <u>Miranda</u> rights, it is unlikely that such a conclusion would have been reached based on Jackson's simple reaction in putting his head down on the table after being caught in a lie.  Thus, Jackson has not demonstrated by a reasonable probability that the outcome of the <u>Miranda</u> proceedings or the trial would have been different, but for counsel's failure to call Dr. Mack at the <u>Miranda</u> hearing.

Finally, this Court finds nothing to indicate that the state court decision on this issue was based on an unreasonable application of the facts in light of the evidence presented at the <u>Miranda</u> hearing, at trial and at the PCR proceedings.  Nor was the court's decision contrary to established federal law set forth in <u>Strickland</u>.  Jackson has not demonstrated that the state court decision, when evaluated objectively and on the merits, resulted in an outcome that cannot be reasonably justified. <u>Matteo</u>, 171 F.3d at 891.  Accordingly, this ground of ineffective assistance of trial counsel will be denied for lack of substantive merit.

42

2.  *Failure to Inform Petitioner of His Right to Testify*

Next, Jackson argues, in Ground 10 of his Amended Petition, that his trial counsel was ineffective in not telling him he had a right to testify in the guilt phase of his trial.  However, counsel apparently told the jury in opening remarks that Jackson would testify, and the failure to call him made the jury think that petitioner was lying.  This issue was raised in Jackson's state PCR proceedings and the court ruled, without discussion, that there was no ineffectiveness of counsel.  (Resp. Ex. 132, PCRT, 28:14-21).

A defendant in a criminal trial has a constitutional right to testify on his or her own behalf.  Rock v. Arkansas, 483 U.S. 44, 51-53 (1987).  The right to testify at one's trial is a fundamental right which can be waived "only by an 'intentional relinquishment or abandonment.'"  Johnson v. Zerbst, 304 U.S. 458, 464 (1938).  A criminal defendant's right to testify is personal and may not be waived by counsel.  Jones v. Barnes, 463 U.S. 745, 751 (1983); United States v. Leggett, 162 F.3d 237, 245 (3d Cir. 1998), cert. denied, 528 U.S. 868 (1999); United States v. Pennycooke, 65 F.3d 9, 10 (3d Cir. 1995); United States v. Lore, 26 F. Supp.2d 729, 735 (D.N.J. 1998).

In this case, Jackson's argument is facetious and contradictory.  How could Jackson claim that his counsel did not inform him of the right to testify at trial if, at trial, in the

43

opening statement, counsel told the jury that Jackson would testify?  Jackson heard this opening remark.  He knew he had the right to testify.  It seems clear that both counsel and petitioner determined that it was strategically better to avoid testimony on the stand in front of the jury.

Having reviewed the record, this Court does not find any deficient representation by counsel with respect to advising Jackson of his right to testify.  Moreover, the Court also finds that even if counsel was deficient in not fully informing Jackson of his right to testify, petitioner has not satisfied the prejudice prong under Strickland.  There was little to no likelihood that Jackson's testimony at trial would have altered the outcome.  Jackson confessed to a horrific murder that involved over 50 stab wounds to the victim.  The defense was not asserting that Jackson did not stab the victim; rather, that he lacked the mental capacity to know what he was doing at that time.  He had expert witnesses who testified as to his mental impairment with respect to how he did not have the intent to kill.  It is not likely that Jackson's testimony at trial would have aided his defense.  Instead, it was more likely that his testimony could have undermined the psychologist's testimony about a brain impairment since Jackson was an articulate man, and he would have been subject to a cross-examination that would have attempted to refute any question of brain impairment.

44

Therefore, this Court finds nothing in the record to indicate that the state court decision on this issue was based on an unreasonable application of the facts in light of the evidence presented at trial.  Nor were the decisions contrary to established federal law.  Jackson has not demonstrated that the state court decisions, when evaluated objectively and on the merits, resulted in an outcome that cannot be reasonably justified.  <u>Matteo</u>, 171 F.3d at 891.  Accordingly, this claim of ineffective assistance of counsel will be denied as meritless.

F.  <u>Prosecutorial Misconduct</u>

In his Ninth Count of the Amended Petition, Jackson alleges that he was denied a fair trial due to prosecutorial misconduct.[13]  Namely, during the penalty phase of the trial, the prosecutor allegedly misrepresented facts by calling the defense psychologists liars and complaining about the number of mitigating factors in comparison to the one aggravating factor

---

[13]  Jackson also claims that the prosecutor had *ex parte* communication with the state appellate court.  The state PCR court rejected this claim of prosecutorial misconduct, finding that the Appellate Division had already addressed the issue and found no misconduct.  Further, the PCR court held that the claim did not rise to the level of prosecutorial misconduct because the *ex parte* communication was cured by the trial judge in a chambers telephone conference, and it occurred outside the jury's presence.  This Court agrees, and finds Jackson's claim without merit.  As these communications did not occur in the jury's presence or have any effect on the jury trial, the Court concludes that Jackson was not deprived of a fair trial by the alleged prosecutorial misconduct.

asserted by the State.  These comments occurred during the State's summation in the penalty phase of the re-trial.[14]

This claim appears to have been raised on direct appeal. The Appellate Division ruled:

> Defendant contends that the prosecutor engaged in a pattern of personal attacks on defense counsel which reflected a racial prejudice, and that the prosecutor asked improper questions and made improper and prejudicial remarks in opening and closing statements.  Although the prosecutor's remarks were occasionally improperly directed against defense counsel, they occurred out of the jury's presence and had no capacity to influence the jury.  The prosecutor's opening and summation comments were not prejudicially improper, and we conclude that this contention is clearly without merit.

(February 29, 1996 Appellate Division Opinion, at pages 21-22).

Furthermore, the trial judge issued a curative instruction with regard to the prosecution's summation discussing the guilt or innocence of the petitioner.  (Resp. Ex. 130, September 8, 1992 Transcript, 38:12-41:2).

Habeas review of a claim based on prosecutorial misconduct is limited to determining whether the conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).  "The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."  Smith v. Phillips, 455

---

[14]   Petitioner references only the September 8, 1992 trial transcript at pages 34 through 42.  These pages are part of the State's summation.

U.S. 209, 219 (1982).  If it does not infect the entire trial, misconduct alone is not enough to warrant a new trial.  Id. at 220.  "A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments [or conduct] standing alone, for the statements or conduct must be viewed in context."  United States v. Young, 470 U.S. 1, 11 (1985).

However, the U.S. Supreme Court has recognized the obligation of a prosecutor to conduct a criminal prosecution with propriety and fairness.

> He may prosecute with earnestness and vigor – indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. ...  Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

Berger v. United States, 295 U.S. 78, 88 (1935).

"Supreme Court precedent counsels that the reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant."  Moore v. Morton, 255 F.3d 95, 107 (3d Cir. 2001).

This Court finds that the prosecutor's summation did not have the capacity on its own to so infect the penalty phase of the trial with unfairness as to make the resulting sentence a

47

denial of due process.  Even if the remarks were improper, they
did not have a prejudicial impact.  The trial court gave the jury
curative instructions that they were to consider only the
aggravating and mitigating factors in their penalty
determination, and not the issue of petitioner's guilt.
Moreover, there was no prejudice to Jackson because the jury
ultimately found that there were more mitigating factors than
aggravating factors, and did not impose the death penalty.
Therefore, the Court finds no error of constitutional dimension.
Further, the state court decisions were not contrary to, and did
not involve an unreasonable application of, clearly established
federal law; nor were they based on an unreasonable determination
of the facts in light of the overwhelming testimonial evidence
presented in the state court proceedings.  Accordingly, this
claim will be denied.

G.   The Sentence Was Based on His Race

     In his next claim, Jackson argues that his sentence on the
different counts should not have been made to run consecutively.
He states that in his first trial, when the death penalty was
imposed, the judge ran the other sentences concurrent with the
death sentence.  He also contends that he received a life
sentence with a 35-year parole disqualifier because he is Black,
rather than a 30 year term without parole that would have been
imposed on a white defendant.

Sentencing is generally considered a matter of state criminal procedure, which does not fall within the purview of federal habeas review.  <u>United States v. Cepero</u>, 224 F.3d 256, 267 (3d Cir. 2000), <u>cert</u>. <u>denied</u>, 531 U.S. 1114 (2001); <u>Ervin v. Beyer</u>, 716 F. Supp. 163, 165 (D.N.J. 1989); <u>Grecco v. O'Lone</u>, 661 F. Supp. 408, 415 (D.N.J. 1987).  Indeed, absent some constitutional violation, federal courts cannot review a state's alleged failure to adhere to its own sentencing procedure.  <u>Rorie v. Beard</u>, Civ.A.No. 04-3380, 2005 WL 825917, *5 (E.D. Pa. April 7, 2005)(*citing* <u>Branan v. Booth</u>, 861 F.2d 1507, 1508 (11th Cir. 1988)).  Thus, a federal court will not reevaluate a sentence in a habeas proceeding unless it exceeds the statutory limits. <u>Jones v. Superintendent of Rahway State Prison</u>, 725 F.2d 40 (3d Cir. 1984); <u>see</u> <u>also</u> <u>Williams v. Duckworth</u>, 738 F.2d 828, 831 (7th Cir. 1984), <u>cert</u>. <u>denied</u>, 469 U.S. 1229 (1985)("As a general rule, federal courts will not review state sentencing determinations that fall within statutory limits."); <u>Bonner v. Henderson</u>, 517 F.2d 135, 136 (5th Cir. 1975)("This Court will not upset the terms of a sentence within statutory limits unless so disproportionate to the offense as to be completely arbitrary and shocking").

Moreover, federal courts will not interfere with a state's sentencing scheme unless the petitioner can show that no reasonable sentencing court would have found the aggravating

factors necessary to justify imposition of the sentence.  Lewis
v. Jeffers, 497 U.S. 764, 783 (1990).  "While normal sentencing
proceedings are not immune from all due process attacks, the
Supreme Court has required only minimal due process protections
in those proceedings."  United States v. Davis, 710 F.2d 104, 106
(3d Cir.), cert. denied, 464 U.S. 1001 (1983)(citations omitted).

     Here, petitioner has not demonstrated that his sentence
violates any federal constitutional rights.  First, his claim of
racial bias is unsubstantiated and baseless.  Examination of the
sentencing transcript does not reveal any evidence of race being
an issue is sentencing.  Second, and more significantly here, for
purposes of federal habeas review, Jackson's sentence plainly
does not exceed the statutory limits for murder, nor does it
shock the judicial conscience as even remotely excessive.  See
Harris v. United States, 536 U.S. 545, 557 (2002); Wainwright v.
Goode, 464 U.S. 78, 84 (1983).  Thus, Jackson's claim lacks
substantive merit, and is not subject to federal review because
it does not demonstrate a violation of a federal constitutional
right.

H.   Failure to Give Intoxication and Diminished Capacity Charge

     Finally, Jackson alleges that the trial court erred in
failing to charge the jury on the issue of intoxication or
diminished capacity.  He claims that proof of "drug and alcohol

abuse showed a prostration of [his] mental faculties that negated knowing and purposeful [murder]."

Jackson raised the issue on direct appeal.  The Appellate Division rejected the claim:

> At the close of trial, defendant requested an instruction on voluntary intoxication, which the court denied on the ground that defendant had failed to meet the requirements of State v. Cameron, 104 N.J. 42 (1988).  After trial, the court explained the reason for its decision.  The court found defendant's detailed statement to the police showed a vivid recall of events at odds with a claim of intoxication, that there was an absence of testimony that defendant was intoxicated, and that he seemed quite sober to Brown, who was with defendant in the hours just after the murder.  The court also found that there was "no indication that Defendant consumed a substantial amount of intoxicants or that he was so impaired that he was incapable of forming an intent."

> > In conclusion, despite limited evidence that Defendant consumed a small amount of alcohol and marijuana before he stabbed Ms. Levithan, there was little or no evidence showing that Defendant was impaired to the level of "prostration of the faculties."  Therefore, a jury charge on voluntary intoxication was not warranted.

Voluntary intoxication may negate the mental states, knowing and purposeful conduct, required to prove murder.  N.J.S.A. 2C:2-8.  A jury instruction on the defense of voluntary intoxication is warranted where the intoxication was sufficient to render the defendant incapable of forming the mental state required for murder, i.e., when the defendant's intoxication from drugs or alcohol caused a prostration of his mental faculties.  Cameron, supra, 104 N.J. at 53-54.

The Court in Cameron found no error in refusal to give an intoxication instruction where the charge was aggravated assault, and both the victim as well as the defendant testified the defendant was drunk, since despite these conclusionary assertions "there is not the slightest suggestion that she did not know what she was doing or that her faculties were so beclouded by the wine that she was incapable of engaging in purposeful conduct."  Id. at 57.

51

Courts have reached the same conclusion in murder cases:
<u>State v. Gerald</u>, 113 N.J. 40, 122 (1988)(evidence of the
defendant's drug and alcohol use on the day of the killing
failed to reasonably demonstrate sufficient intoxication);
<u>State v. Zola</u>, 112 N.J. 384, 423-25 (1988)(doctor's
testimony that the defendant was increasingly drug and
alcohol dependent prior to the killing was insufficient to
show incapacity to act with purpose or knowledge on the day
of the crime); <u>State v. Buhl</u>, 269 N.J. Super. 344, 365-66
(App. Div. 1994)(no error to refuse intoxication instruction
where evidence was insufficient to indicate the defendant
was rendered incapable of purposeful or knowing conduct);
<u>State v. Selby</u>, 183 N.J. Super 273, 284 (App. Div. 1981)(no
error in refusing intoxication instruction where the
defendant's good recall and awareness of details surrounding
the victim's death belied his intoxication claim)> Under the
standard announced in <u>Cameron</u> and applied in these cases,
the evidence in the present case was insufficient to warrant
an intoxication instruction.

(February 29, 1996 Appellate Division Opinion, at pgs. 23-25).

Questions relating to jury charges are normally matters of
state law and are not cognizable in federal habeas review.  <u>See
Engle v. Isaac</u>, 456 U.S. 107 (1982); <u>Henderson v. Kibbe</u>, 431 U.S.
145 (1977); <u>Zettlemoyer v. Fulcomer</u>, 923 F.2d 284, 309 (3d Cir.),
<u>cert</u>. <u>denied</u>, 502 U.S. 902 (1991); <u>Grecco v. O'Lone</u>, 661 F. Supp.
408, 412 (D.N.J. 1987)(Thompson, J.).  Only where the jury
instruction is "so prejudicial as to amount to a violation of due
process and fundamental fairness will a habeas corpus claim lie."
<u>Id</u>.

Where a federal habeas petitioner challenges jury
instructions given in a state criminal proceeding,

[t]he only question for us is "whether the ailing
instruction by itself so infected the entire trial that
the resulting conviction violates due process."  It is
well established that the instruction "may not be

52

> judged in artificial isolation," but must be considered
> in the context of the instructions as a whole and the
> trial record. In addition, in reviewing an ambiguous
> instruction ..., we inquire "whether there is a
> reasonable likelihood that the jury has applied the
> challenged instruction in a way" that violates the
> Constitution. And we also bear in mind our previous
> admonition that we "have defined the category of
> infractions that violate 'fundamental fairness' very
> narrowly." "Beyond the specific guarantees enumerated
> in the Bill of Rights, the Due Process Clause has
> limited operation."

Estelle v. McGuire, 502 U.S. 62, 72-73 (1991) (citations

omitted). Thus, the Due Process Clause is violated only where

"the erroneous instructions have operated to lift the burden of

proof on an essential element of an offense as defined by state

law." Smith v. Horn, 120 F.3d 400, 416 (1997), cert. denied, 522

U.S. 1109 (1998). See also In re Winship, 397 U.S. 358, 364

(1970) ("the Due Process Clause protects the accused against

conviction except upon proof beyond a reasonable doubt of every

fact necessary to constitute th crime with which he is charged");

Sandstrom v. Montana, 442 U.S. 510, 523 (1979) )(jury

instructions that suggest a jury may convict without proving each

element of a crime beyond a reasonable doubt violate the

constitutional rights of the accused).

Where such a constitutional error has occurred, it is

subject to "harmless error" analysis. Smith v. Horn, 120 F.3d at

416-17 (1997); Neder v. United States, 527 U.S. 1, 8-11 (1999).

"[I]f the [federal habeas] court concludes from the record that

the error had a 'substantial and injurious effect or influence'

on the verdict, or if it is in 'grave doubt' whether that is so, the error cannot be deemed harmless." Smith v. Horn, 120 F.3d at 418 (citing California v. Roy, 519 U.S. 2, 5 (1996)).  In evaluating a challenged instruction,

> a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.  If the charge as a whole is ambiguous, the question is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution.

Middleton v. McNeil, 541 U.S. 433, 437 (2004) (internal quotations and citations omitted).

In this case, Jackson has failed to present sufficient evidence to show that the absence of the jury instruction on intoxication denied him due process.  This claim merely challenges the trial judge's actions under New Jersey law concerning when an intoxication charge is warranted.  Because the alleged error in failing to give a voluntary intoxication instruction raises at best only issues of state law, there is no authority to grant federal habeas corpus relief.  See Carpenter v. Vaughn, 296 F.3d 138, 153 (3d Cir. 2002).

Moreover, there was no error by the trial court in failing to give a jury instruction on the issue of voluntary intoxication as facts pertaining to an intoxication defense were not presented to a jury.  Thus, the trial court's omission of a specific jury instruction with respect to intoxication was not error, let alone

an error of constitutional magnitude.  "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."  <u>Henderson v. Kibbe</u>, 431 U.S. at 155. In this case, both the trial court and the Appellate Division determined that there was insufficient evidence of petitioner's intoxication to warrant an intoxication instruction.  Thus, the petitioner has not shown, as required by 28 U.S.C. § 2254(d), that the actions of the trial court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Accordingly, this ground for a writ of habeas corpus will be denied.

## IV.   <u>CERTIFICATE OF APPEALABILITY</u>

This Court next must determine whether a certificate of appealability should issue.  <u>See</u> Third Circuit Local Appellate Rule 22.2.  The Court may issue a certificate of appealability only if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  For the reasons discussed above, this Court's review of the claims advanced by petitioner demonstrates that he has failed to make a substantial showing of the denial of a constitutional right

necessary for a certificate of appealability to issue.  Thus, this Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).

### CONCLUSION

For the above reasons, this Court finds that the § 2254 habeas petition should be denied on the merits and a certificate of appealability will not issue.  Jackson's motions for an evidentiary hearing and for judicial notice are dismissed as moot.  An appropriate Order follows.


s/Anne E. Thompson
ANNE E. THOMPSON
United States District Judge

DATED: 5/5/06

56